# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| DTN, LLC,<br><br>       Plaintiff,<br><br>vs.<br><br>MATTHEW WALSH,<br><br>       Defendant. | **Case No.**<br><br>**VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF** |

Plaintiff DTN, LLC, formerly known as Telvent DTN, LLC ("DTN" or "Plaintiff"), for its Verified Complaint against Defendant Matthew Walsh ("Walsh"), states and alleges as follows:

## INTRODUCTORY STATEMENT

Defendant Walsh was a senior DTN officer charged with receiving, using, and safeguarding highly sensitive, confidential, and proprietary data and information that is uniquely important to DTN. Walsh recently began plotting to convert such sensitive information and data, including the development of a unique competitive business, the success of which is founded upon, among other things, the valuable secrets, strategies, information, and data that Walsh was furnished and continues to possess, for the benefit of a direct DTN competitor, Walsh's future employer, Granular, Inc. ("Granular"). Walsh's scheme included receiving and downloading DTN sensitive, proprietary, confidential, and secret information and data, including DTN's plans, strategies, and model for DTN's industry-leading proprietary grain trading business, sending such information to private Walsh e-mail accounts for later commercial use when Walsh joined Granular.

151694.00101/106348638v.1

Walsh recently attended confidential and high-level DTN meetings with the intent and purpose to learn and convert even more DTN confidential information, including on November 15-16, 2017, at which DTN's future strategic plans were presented and discussed, including details of DTN's planned or possible acquisitions and new business strategies.  Walsh never disclosed to DTN his plans to depart DTN when he attended these important meetings and received valuable information.

After converting DTN data, information, strategies, and business models, Walsh resigned from DTN on November 17, 2017, with his resignation to be effective December 1, 2017.  Walsh announced during his telephone resignation that he had accepted a similar position with Granular, but neglected to mention that he improperly possessed and either conferred to, or was planning to confer to Granular and its parent company, Pioneer Hi-Bred International, Inc. ("Pioneer"), and/or its parent DowDupont, DTN's proprietary and confidential data and information, including DTN know-how.

Walsh's scheme to convert confidential data, information, trade secrets, know-how, plans, and business models – all of which Walsh was in a position to obtain and unlawfully disclose to a competitor, was in furtherance of his secretly planned departure from DTN to join Granular, intending to launch for Granular (or assist in launching) the same competing business (grain trading portal) that DTN had invested so heavily to research, build, and launch.  Indeed, during his last months and days at DTN, Walsh was planning or contemplating his exit, absorbing and taking as much information as possible to assist Granular's competing venture.

Walsh secreted confidential DTN information and customer lists to his personal e-mail, in violation of DTN company policy and Walsh's legal duties to DTN.  This information is extremely valuable to DTN's competitors, including Granular/Pioneer and their parent company,

DowDupont, and no amount of monetary damages are immediately available or may be calculated to account for such a loss.

Walsh's scheme included on November 15-16, 2017 – two days before his resignation – participating in DTN senior leadership strategic meetings at which highly confidential company strategies and business plans were revealed and discussed.  Some of the discussions over two days concerned Pioneer and Granular directly, but all of the meeting topics and details are of keen interest to Granular and Pioneer.  Walsh participated in these high-level meetings despite having already accepted or, at least having negotiated his new position at Granular.

Granular's parent, Pioneer is not only a direct competitor of DTN, but also is a former DTN joint venture partner.  The business relationship between DTN and Pioneer recently terminated, with DTN asserting breaches of the parties' Collaboration and License Agreement, a history Walsh was well aware of at the time of his resignation, including having previously conferred with DTN's attorneys about DTN's potential legal claims against Pioneer.

During his employment with DTN, Walsh served as Vice President of Agribusiness.  He ultimately became the Acting Vice President of Agriculture – DTN's largest business unit – and the head of DTN's Leadership Team.  Walsh was charged with overseeing and managing the development and rollout of DTN's industry-leading Grain Trading Portal, a unique and proprietary software platform through which commodities buyers and sellers communicate. DTN spent millions of dollars and years of considerable effort to develop its proprietary portal, and Walsh spearheaded that effort.  As an executive and leader of the business, Walsh had virtually unlimited access to many forms of proprietary and confidential information related to the company's business and strategic plans.  Walsh's duties also included developing relationships of confidence and trust with key customers and growing DTN's good will.  When

151694.00101/106348638v.1

he resigned, Walsh advised DTN that he was leaving to help Granular develop a competing software platform that would challenge DTN's Grain Trading Portal.  And DTN soon learned that Walsh had secreted highly confidential materials from DTN, including a key customer list.

While employed as an executive at DTN, Walsh signed a non-compete agreement, barring Walsh from competing in a similar or competitive business for a period of twelve (12) months following his separation from DTN.  Walsh's expected new employment with Granular and stated intention to develop a competing grain trading portal is a direct violation of his contractual obligations, and the transfer of DTN proprietary information to assist in developing the competing portal is a violation of both federal and Minnesota law.

DTN is entitled to an order restraining Walsh from joining the competing Granular, especially in the announced position of creating for Granular the competing grain trading portal, and to prevent the continued and future inevitable disclosure of DTN's trade secrets and confidential and proprietary information.

## PARTIES

1.      DTN is a Delaware limited liability company with its principal place of business and corporate headquarters in Burnsville, Minnesota.  DTN's members are DTN Services Holdings, LLC, a Delaware limited liability company, and DTN Ag, LLC, a Delaware limited liability company.  The member of DTN Services Holdings, LLC is DTN US Holdings, LLC, a Delaware limited liability company; the member of DTN US Holdings, LLC is TBG Holdings DTN BV, an entity organized under the laws of the Netherlands.  The member of DTN Ag, LLC is TBG Holdings DTN BV, an entity organized under the laws of the Netherlands.

151694.00101/106348638v.1

2.      Walsh resides in Daniel Island, South Carolina 29464.  Walsh is employed by DTN and, according to his representation to DTN, has accepted employment at Granular effective after December 1, 2017.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because DTN has asserted a claim for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, as amended.

4.      The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      The Court has personal jurisdiction over Walsh because: (i) since at least 2007 he has regularly visited and conducted business in Minnesota, (ii) he entered into a contract in Minnesota with Plaintiff that was drafted, issued and signed by a DTN representative in Minnesota that he has now breached, and (iii) he was an employee of a Minnesota-based company at the time he committed the violations alleged herein by misappropriating confidential information and trade secrets belonging to Plaintiff.

6.      Pursuant to 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the events or omissions giving rise to these claims occurred in this District, and the activities complained of affect commerce in this District.  There is no other venue among the federal courts that has a stronger relationship with the facts and circumstances of this matter.

7.      No other court or jurisdiction has a greater interest in the facts and circumstances of this matter.

151694.00101/106348638v.1

8.      All of the torts, breaches, and claims asserted herein were committed wholly or partially in the State of Minnesota and/or were committed outside Minnesota but caused injuries to persons or property within the State of Minnesota by Walsh, who regularly conducts business in Minnesota.  Walsh reasonably expected (or should have expected) that such torts, breaches, and claims would have consequences in Minnesota.

## FACTUAL ALLEGATIONS

A.      **Background**

9.      DTN provides products and services to empower aviation, agriculture, oil and gas, trading, and weather-sensitive industries.

10.     DTN owns and operates *The Progressive Farmer* magazine, the premier publication in the agriculture business.

11.     DTN is headquartered in Minnesota, although it has offices and provides products and services globally.

12.     DTN services approximately 600,000 global and U.S. customers with numerous products and services, including streaming data services and trading solutions that accurately cover the agricultural, energy and financial marketplace.  DTN's success is dependent, in part, on its ability to protect its confidential and proprietary information and trade secrets, including its software and analytics tools, customer information (both current and prospective), business strategies, business forecast information, operating procedures, pricing, and sales and marketing plans.

13.     DTN and Granular are direct competitors.

14.     Like DTN, Granular is a provider of software and analytics tools that help farmers improve efficiency, profitability, and sustainability.

151694.00101/106348638v.1

B.      **Walsh's Employment and Related Non-Competition Agreement**

15.     From 2002 to 2007, Walsh was the Chief Executive Officer of QuickFarm, Inc. ("QuickFarm")

16.     Walsh became an employee of DTN through DTN's acquisition of QuickFarm in or about 2007.   In connection with the sale of QuickFarm to DTN and DTN's subsequent employment of Walsh following the acquisition of QuickFarm, Walsh entered into a May 14, 2007 Noncompete, Nonsolicitation and Nondisclosure agreement with Telvent DTN, Inc., which later converted to Telvent DTN, LLC.  A true and correct copy of the May 14, 2007 agreement is annexed as Ex. A.  That agreement restricted Walsh from competing, directly or indirectly as an employee or agent of a competitor, against DTN throughout the United States.

17.     Walsh's original non-compete expired after four years (Ex. A at Art. 2) and ultimately was replaced when Walsh was promoted to Vice President of Business Development on May 5, 2011 by a Non-Competition Agreement between Walsh and Telvent DTN, which changed its name to Plaintiff, DTN on or about June 20, 2017, that provided similar non-competition, non-solicitation, and other restrictions (the "Non-Competition Agreement").  A true and correct copy of the Non-Competition Agreement is annexed as Ex. B.

18.     The Non-Competition Agreement provides in pertinent part:

*No Competition:  You agree that for a period of twelve (12) months following your termination, you shall not directly or indirectly (i) engage for your own account in any business similar to or competitive with any business presently or hereafter conducted by [DTN] or any of the Related Entities or (ii) perform any services in any capacity for any person or entity or any business similar to or competitive with, (other than with the consent of the CEO of [DTN], which constitute engaging in any of the Businesses in any capacity.   It shall be understood that the non-compete is not meant to preclude you from viable alternative employment.   However it is expected that any alternative employment that is questionable in terms of potential breach of the terms in your offer letter or in this agreement will be disclosed by you to [DTN] prior to accepting alternative employment for our review.* (See Ex. A)

151694.00101/106348638v.1

19.     In consideration for signing the Non-Competition Agreement, Walsh received a substantial increase in annual base pay – which he received for over six years, eligibility for a bonus of up to 30% of his base salary, payment of graduate school tuition up to $140,000 – which he used to pursue an MBA from Northwestern University, continued employment and significant additional consideration, including being given access to DTN's confidential and trade secret information and valuable business relationships.  Indeed, Walsh bargained for the restriction and accepted the benefits of agreeing to be bound by it.  DTN would not have provided these benefits to Walsh had he not agreed to be bound by the Non-Competition Agreement.

20.     Walsh regularly reported to DTN in Minnesota, where DTN's main operations are located.  Walsh traveled at least monthly to DTN's Minnesota headquarters in connection with his executive and employment responsibilities, but more frequently communicated with DTN management and employees resident at the company's Minnesota headquarters.

21.     Walsh acknowledged DTN's information management protocols and protections of confidential, sensitive, and proprietary business information when he reviewed DTN's Employee Handbook and Electronic Media Use Policy when he was hired, executing these documents' respective accompanying acknowledgments.  Walsh was aware of the restrictions in DTN's Employee Handbook and Electronic Media Use Policy.

22.     The Employee Handbook provides, among other things, that *"All information composed, sent or received on the electronic media systems are and remain the property of DTN,"* and that *"the E-mail system and intranet should not be used to send (upload) or receive (download) copyrighted materials, trade secrets, proprietary financial information or similar*

*materials without prior authorization from DTN management."* (A true and correct copy of the relevant sections of the Employee Handbook is attached as Ex. C)

23.     Additionally, the Employee Handbook specifically identifies transmitting *"trade secrets, proprietary financial information, or similar materials without prior authorization"* and *"sending any information that would be considered confidential without the appropriate security measures built in."* (Ex. C)  Walsh was aware of these restrictions at the time he executed acknowledgement of the Employee Handbook and during the course of his employment with DTN.

24.     In 2012, Walsh's responsibilities were expanded, with Walsh assuming the title and responsibilities of Vice President of Agribusiness.

25.     Walsh's responsibilities continued to increase over time, and by the time he resigned Walsh was Acting Vice President of Agriculture – the largest business unit at DTN – and the head of the DTN Leadership Team.

**C.     <u>Walsh's Employment and DTN's Confidential and Proprietary Information</u>**

26.     During his employment with DTN as Vice President of Agribusiness and as Acting Vice President of Agriculture, Walsh oversaw and was fully responsible for all of DTN's agriculture business, including its grain trading operations.  In this position, Walsh traveled extensively, meeting regularly with DTN's agriculture customers and clients and was responsible for developing relationships of trust and confidence with key customers.   Walsh also handled buy decisions on products and services and arranged sales and pricing strategies for customers.

27.     Walsh further managed numerous employees, including project managers who developed proprietary and confidential trade secrets, including, but not limited to confidential and proprietary software.

28.     DTN has expended significant sums of money to research, design, and develop its software and analytics tools, including its proprietary Grain Trading Portal.  After expending substantial sums of money, and after years of extensive research and testing, DTN developed its Grain Trading Portal, which is distinguishable from competitors in the industry.

29.     DTN's Grain Trading Portal provides a platform through which buyers and sellers of commodities communicate.  The Grain Trading Portal is a comprehensive grain management solution that streamlines and simplifies the entire grain trading process – a portal in performance and functionality not developed by any other DTN competitor.

30.     The Grain Trading Portal centralizes all offers and contains features that optimize and protect trading margins.  It supports easy, real-time management of transactions, and it allows customers to maximize their cash marketing.  DTN's Grain Trading Portal has become the most-trusted, front-end grain trading solution in the industry.

31.     DTN has invested substantial time, money, and resources developing confidential and proprietary information, including its Grain Trading Portal, as well as its marketing and business strategies, and developing long-term relationships with customers.

32.     DTN takes precautions to protect its confidential information and trade secrets. In addition to the Employee Handbook and corporate policies referenced above, DTN also takes active steps to limit dissemination of sensitive information.

33.     Only authorized employees of DTN have access to the company's confidential information and trade secrets, and all DTN employees are obligated to use this information only in connection with their employment at DTN.  All employees have a duty not to disclose to third-parties DTN's confidential information and trade secrets.

151694.00101/106348638v.1

34.     If the confidential and proprietary information and trade secrets referenced in the preceding paragraphs were to become available to a competitor, such as Granular/Pioneer, or otherwise became public knowledge, DTN's competitive advantage and substantial investment in such trade secrets and confidential information would be irreparably injured and/or destroyed.

35.     In his executive role at DTN, Walsh provided input into, oversaw, managed, and assisted with the development of DTN's Grain Trading Portal.   Walsh was intimately familiar with the Grain Trading Portal and steered DTN business and customers to the portal, becoming familiar with its proprietary development and performance, and providing input to such development.   Walsh also provided recommendations as to the portal's design and utility to customers.

36.     In his executive role at DTN, Walsh was intimately involved with identifying merger and acquisition ("M&A") targets and in negotiating potential M&A transactions.   Such targets and transactions were regularly governed by nondisclosure agreements, which were executed between DTN and the identified M&A target, as well as with nondisclosure agreements Walsh signed personally.

37.     Walsh learned and possesses particular M&A target information specific to DTN, which information DTN spent considerable time and sums developing and cultivating, and may transfer (or has transferred) such knowledge to Granular, to the commercial detriment of DTN.

38.     While employed by DTN, Walsh was intimately involved in the development and implementation of marketing and business strategies, and he was paramount in developing long-term relationships with customers.

39.     Indeed, the two days immediately before his resignation, Walsh actively participated in DTN senior leadership meetings at which confidential company information and strategies were discussed.

40.     The topics discussed at those meetings included DTN's connected supply chain strategy, potential acquisition targets to implement that strategy, planned product innovations, and workflow process improvements.

41.     Upon information and belief, Walsh had already discussed and been offered a position at Granular when he participated in the November 15-16, 2017 critical DTN meetings.

42.     Walsh had accepted a position at Granular before the November 15-16, 2017 meetings at DTN.

43.     Upon information and belief, Walsh intentionally participated in the DTN November 15-16, 2017 meetings in order to learn more critical high-level details and information about DTN's business plans with its Grain Trading Portal and other business interests and plans, allowing Walsh to join Granular armed with this strategic information to assist Granular in competing against DTN through the use of similar technology.

44.     Walsh, by his own admission, will be charged by Granular with constructing Granular's competing grain trading portal.

45.     Since Walsh's resignation, DTN has learned that Walsh, months prior to resigning and perhaps through the date of his resignation, was redirecting confidential and proprietary business information to his personal email account with no legitimate reason to do so, in violation of DTN company policies and Walsh's duties to DTN.

46.     For instance, Walsh forwarded to himself in June 2017 a highly confidential list of the DTN 2016-17 'Top 100 Customers,' in addition to other proprietary information and data

Walsh converted from DTN, the scope of which will be discerned through a forensic examination of Walsh's DTN-owned computer and/or smart phone and through discovery. Walsh had no legitimate reason to forward the customer list to his home email and did so in direct violation of company policy.

47.     Upon information and belief, Walsh was engaged in these behaviors for the benefit of himself and DTN's competitors, and to the commercial detriment of DTN.

**D.    Walsh's Resignation and Competition with DTN Through Granular**

48.     Shortly before Walsh resigned his DTN employment, DTN was exploring Myriad Mobile LLC ("Myriad"), a North Dakota company, as a strategic M&A target.

49.     In Walsh's executive position with DTN, he was intimately familiar with the details surrounding DTN's strategy related to Myriad, including the reasons and benefits of the possible acquisition.

50.     On or about October 12, 2017, DTN's Board of Directors instructed that only the Board of Directors and one selected DTN employee would be permitted to have any contacts with Myriad or Pioneer concerning the possible acquisition.

51.     Walsh was not the employee designated as the point of contact for Myriad or Pioneer.

52.     He was thus prohibited from contacting Myriad or Pioneer relating to DTN's business.

53.     On or about October 23, 2017, DTN entered into an exclusive Letter of Intent ("LOI") with Myriad.

54.     The day after signing the LOI, Pioneer informed DTN that it was aware DTN had signed the LOI with Myriad.

55. Upon information and belief, Walsh disclosed confidential information about the Myriad LOI to Pioneer and/or Granular while he was employed by DTN and before he submitted his resignation from DTN for the reason that, upon information and belief, Granular, like DTN, was interested in making a bid to acquire Myriad.

56. Walsh may have disclosed other DTN M&A target information to Granular/Pioneer, that is, to DowDupont, as he was in a position to learn and know such information and, absent an injunction preventing Walsh from joining Granular, will be in a position to transfer such critical and confidential information to a major DTN competitor.

57. On November 17, 2017, shortly after attending a multi-day high level strategy meeting, Walsh resigned from DTN effective December 1, 2017. (A true and correct copy of Walsh's resignation letter is attached as Ex. D)

58. Upon resigning from his employment at DTN, Walsh informed DTN that he was departing to work for Granular, and would be assisting Granular in the development of a grain trading technology platform similar to DTN's Grain Trading Portal.

59. During his resignation meeting, Walsh told DTN that he had contacted high-level Pioneer/Granular officers on October 30 and 31, 2017, and offered to help Pioneer/Granular set up "a world class grain trading platform."

60. Granular currently provides products and services that are directly competitive to those offered and provided by DTN, but does not have a grain trading platform.

61. Granular desires to develop and build a platform similar to DTN's Grain Trading Portal, which would place Granular in a position to compete directly with DTN through the use of similar technology.

151694.00101/106348638v.1

62.     Walsh's employment with Granular will irreparably and permanently harm DTN and its business interests if the confidential and proprietary information possessed by Walsh continues to be conferred to Granular, especially given Walsh's: (1) level of DTN-trained and acquired experience and expertise that will now be advanced to assist a direct competitor in violation of Minnesota law and the Non-Competition Agreement; (2) detailed and intimate knowledge regarding DTN's proprietary software, namely the Grain Trading Portal, and efforts to build, develop, and operate the important portal; (3) knowledge of DTN's confidential information, targeted acquisitions, and business strategies shared with Walsh at the high-level DTN meetings on November 15-16, 2017; (4) extensive knowledge of DTN's confidential customer information and relationships; and (5) employment with Granular in a high-level position.

63.     Walsh has conveyed and through his employment by Granular/Pioneer threatens to convey all of the confidential and proprietary information, data, trade secrets, processes, know-how, information, plans, and business strategies of DTN identified herein and that were learned by Walsh in his position as a  DTN officer and employee for over ten years.

64.     Additionally, due to the unique nature of the industry, Walsh's intimate knowledge of DTN's proprietary and confidential information, and Walsh's putative high-level leadership position at Granular, it is inevitable that Walsh will (continue to) disclose DTN's trade secrets and confidential information, including information relating to the development, design, operation, and utility of DTN's Grain Trading Portal, marketing programs, and customer information. That information will allow Granular to compete unfairly against DTN in the highly competitive market.

## COUNT I – BREACH OF CONTRACT

65.     DTN restates and realleges all paragraphs in this pleading as if fully set forth herein.

66.     Walsh entered into the Non-Competition Agreement in connection with his employment with DTN.

67.     Walsh has breached the Non-Competition Agreement by accepting employment with Granular.

68.     Walsh has violated DTN's Employee Handbook and policies regarding the handling of confidential and proprietary information.

69.     Walsh's violations have caused, and will cause, immediate and irreparable harm to DTN as set forth above.

70.     Unless restrained, Walsh's breaches will cause irreparable harm to DTN because the proprietary and confidential information and data that Walsh possesses, some of which information Walsh already has redirected to his personal email account, has and will continue to be transferred to a direct DTN competitor, causing DTN considerable commercial harm, the damages of which cannot be reasonably calculated at the time of the filing of this pleading.

71.     Ultimately, Walsh's breach of contract will cause DTN monetary damages in an amount not subject to calculation but to be determined at trial after issuance of an injunction.

## COUNT II - MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT OF 2016

72.     DTN restates and realleges all paragraphs in this pleading as if fully set forth herein.

73.     While employed by DTN, Walsh obtained access to DTN's confidential information and trade secrets.

74.     DTN's confidential information and trade secrets known by Walsh are related to DTN's products and services that are used in or intended for use in, interstate commerce.

75.     DTN has taken reasonable steps to protect the confidential nature of its trade secrets.

76.     Despite those steps, Walsh has misappropriated DTN confidential information and trade secret materials.

77.     Walsh has threatened to use and/or has used and is continuing to use DTN's confidential information and trade secrets.

78.     In doing so, Walsh is maliciously and willfully using misappropriated confidential, proprietary, and trade secret information to his own advantage for the benefit of a direct competitor of DTN.

79.     Walsh has threatened to use and/or has used and is continuing to use DTN's confidential information and trade secrets to develop a technology platform similar to DTN's Grain Trading Portal.

80.     In doing so, Walsh maliciously and willfully misappropriated confidential, proprietary, and trade secret information to his own advantage and for the benefit of a direct competitor of DTN.

81.     Walsh acquired trade secrets, knowing or having reason to know that such trade secrets have or are intended to be improperly disclosed without DTN's consent.

82.     Walsh's employment with Granular, a competitor of DTN, will inevitably lead him to rely on DTN's trade secrets.

83.     Indeed, the overlap of the Walsh's high-level responsibilities with DTN and his anticipated high level of responsibility at Granular render Walsh's mere employment with Granular a disclosure of DTN's confidential material and trade secrets.

84.     As a result of Walsh's misappropriation and use of the confidential, proprietary, and trade secret information, Walsh has violated the DTSA.

85.     Walsh's actual and/or threatened misappropriation of DTN's trade secrets has caused and will continue to cause DTN irreparable harm and, possibly, monetary damages if he is not enjoined from working at Granular and/or disclosing such trade secrets to Granular.

86.     Walsh willfully and maliciously misappropriated DTN's trade secrets, thus entitling DTN to an award of exemplary damages under the DTSA.

87.     DTN has no adequate remedy at law.

**COUNT III – MISAPPROPRIATION OF CONFIDENTIAL
INFORMATION/TRADE SECRETS IN VIOLATION OF
THE MINNESOTA UNIFORM TRADE SECRETS ACT**

88.     DTN restates and realleges all paragraphs in this pleading as if set forth fully herein.

89.     DTN's confidential and proprietary information are trade secrets under the Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.01, subd. 5.

90.     Walsh has deep and intimate knowledge of the confidential and proprietary information disclosed to him by DTN.

91.     Upon information and belief, in his new employment at Granular, it will be impossible for Walsh to discharge his duties without using his knowledge of DTN's confidential and proprietary information for Granular's benefit.

151694.00101/106348638v.1

92.     Specifically, due to his function and job duties at DTN and Granular, the similar products and services offered by DTN and Granular, and the potential for misuse of DTN's confidential and proprietary information given the competition for market share between DTN and Granular, it is inevitable that Walsh will use DTN's confidential and proprietary information to his and Granular's competitive advantage.

93.     Walsh, could not, for example, fulfill his responsibilities to assist Granular in the development of a technology platform similar to DTN's Grain Trading Portal without using the confidential and proprietary information he obtained at DTN.  Such inevitable disclosure and use of that information will be patently wrongful.

94.     DTN has made reasonable efforts to maintain the secrecy of its confidential and proprietary information.

95.     Despite those steps, Walsh has misappropriated DTN confidential information and trade secret materials.

96.     The confidential and proprietary information Walsh threatens to misappropriate and/or has actually misappropriated are unique to DTN and not generally known in the industry. A significant part of their value derives from the fact that they are not generally known by Granular or by other competitors in the industry who could obtain economic value from their disclosure or use.  Specifically, Walsh's use and disclosure to Granular of his knowledge of the development of, and know-how associated with DTN's Grain Trading Portal, DTN's strategy related to Myriad, DTN's marketing and business strategies, acquisition targets, and his knowledge of and access to customer relationships, will permit Granular to unfairly compete with DTN.

97.     Walsh's high-level responsibilities at DTN, and his anticipated high level of responsibility at Granular, render Walsh's mere employment with Granular a disclosure of DTN's confidential material and trade secrets.

98.     As a direct and proximate result of Walsh's actual and inevitable further disclosure of DTN's trade secrets and/or confidential and proprietary information, DTN has been and/or will be injured in its business and property.

99.     As a direct and proximate result of Walsh's actual, threatened, and inevitable disclosure of DTN's trade secrets and/or confidential and proprietary information, DTN has suffered and/or will suffer irreparable harm.

## COUNT IV – BREACH OF THE DUTY OF LOYALTY

100.     DTN restates and realleges all paragraphs in this pleading as if set forth fully herein.

101.     An implied condition in every employment relationship is the employee's duty of loyalty to the employee's employer.

102.     That duty is heightened when the employee is a high-level executive, such as Walsh.

103.     An employee's duty of loyalty prohibits the employee from competing against the employer while still employed.

104.     Prohibited acts include disclosing an employer's confidential information and diverting an employer's business opportunities to a third party.

105.     Upon information and belief, Walsh began competing with DTN before his November 17, 2017 resignation.

151694.00101/106348638v.1

106.    In June 2017, Walsh began using DTN's computer systems to transfer DTN's sensitive, confidential, and proprietary business information to Walsh's personal email account.

107.    Upon information and belief, after October 12, 2017, but while still employed with DTN, Walsh disclosed confidential information in violation of the Non-Competition Agreement and in violation of Minnesota law about the Myriad LOI to Pioneer and/or Granular for the reason that, upon information and belief, Granular, like DTN, was interested in making a bid to acquire Myriad.

108.    Walsh may have disclosed other DTN acquisition information to Granular/Pioneer because Walsh was knowledgeable about such matters from his participation in high-level meetings at DTN and information that was disclosed by DTN to Walsh about such sensitive matters, including potential M&A activity and/or targets.   The unlawful disclosure of such information will substantially and commercially compromise DTN.

109.    On October 30 and 31, 2017, while still employed by DTN, Walsh contacted Pioneer/Granular and offered to provide competitive services to Pioneer/Granular to the detriment of DTN.

110.    On November 15-16, 2017, despite having offered to provide competing services to Pioneer/Granular several weeks earlier, Walsh participated in high-level strategy sessions where confidential business information of DTN was disseminated and discussed.

111.    Walsh has repeatedly breached his duty of loyalty to DTN for the benefit of himself and Granular/Pioneer, and their parent, DowDuPont.  Walsh breached his duty of loyalty to DTN.

## COUNT V – INJUNCTION

112.     DTN restates and realleges all paragraphs in this pleading as if set forth fully herein.

113.   DTN is entitled to a temporary restraining order and permanent injunction restraining Walsh from (i) joining the competing Granular, especially in the announced position of creating for Granular the competing grain trading portal; and (ii) the continued and future (inevitable) disclosure of DTN's trade secrets and confidential and proprietary information. Walsh should be ordered to return to DTN all compromised and converted proprietary and confidential information that is owned by DTN.

114.   If not permanently restrained from joining Granular before November 18, 2018, Walsh's employment with Granular will afford to Granular an improper benefit at the expense of DTN, specifically converting confidential, proprietary, sensitive, technical, and private information, data, and know-how from DTN to Granular/Pioneer.  Such information and its accompanying trade secrets will bestow upon Granular/Pioneer an improper benefit at the commercial and market expense of DTN, in violation of law.

115.   Unless permanently restrained, Walsh will continue the flow of misappropriated information, data, know-how, and proprietary information and materials, including customer lists and know-how pertaining to the Grain Trading Portal and DTN's businesses.

116.   DTN does not know the extent of all of the misappropriated information and materials converted by Walsh.

117.   Unless permanently restrained, Walsh will impart to Granular/Pioneer misappropriated information and data from DTN, including proprietary and confidential information, in violation of DTSA, his employment agreement, the company manual and policies, Minnesota law, and common law restrictions.

151694.00101/106348638v.1

118. A temporary restraining order should be issued, followed by a permanent injunction restraining Walsh from joining the competing Granular, especially in the announced position of creating for Granular the competing grain trading portal, and an injunction preventing the continued and inevitable disclosure of DTN's trade secrets and confidential and proprietary information.

**WHEREFORE,** DTN respectfully requests that the Court enter an Order against Walsh:

1. Enforcing Walsh's Non-Competition Agreement and precluding Walsh's employment with Granular or other competitors as per the terms of the Non-Competition Agreement through November 18, 2018 (one year from Walsh's departure date), and thereafter as appropriate;

2. Temporarily and permanently enjoining Walsh from disclosing or using DTN's confidential information and trade secrets to unfairly compete against DTN, including but not limited to using it to develop a technology platform similar to DTN's Grain Trading Portal or to solicit or accept business from DTN's customers, prospective customers or accounts;

3. Ordering Walsh to return any confidential information, trade secrets or other DTN property in Walsh's possession, custody, or control to DTN.

4. For monetary damages, in excess of $75,000, as follows:

   a. compensatory damages, including but not limited to, lost net revenues;

   b. costs, disbursements, and interest; and

   c. attorney's fees expended by DTN in pursuing these causes of action.

5. For such other relief as the Court deems just and appropriate.

151694.00101/106348638v.1

## DEMAND FOR JURY

Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands a jury trial on all issues triable of right by a jury.

Dated this 24th day of November, 2017.

KUTAK ROCK LLP

s/ Alain M. Baudry
Alain M. Baudry #186685
Matthew R. Veenstra #392517
60 South Sixth St., Ste. 3400
Minneapolis, MN  55402-4400
(612) 334-5000 (Telephone)
(612) 334-5050 (Facsimile)
alain.baudry@kutakrock.com

and

BLANK ROME LLP

Samuel D. Levy (application for admission
pro hac vice forthcoming)
Anthony A. Mingione (application for
admission pro hac vice forthcoming)
405 Lexington Ave. – The Chrysler Bldg.
New York, New York 10174-0208
212-885-5000 (Telephone)
212-202-6187 (Facsimile)
slevy@blankrome.com
amingione@blankrome.com

*Attorneys for Plaintiff, DTN, LLC*

151694.00101/106348638v.1

## VERIFICATION

I, Jason Krueger, am the Vice President – Mergers and Acquisitions, of Plaintiff DTN, LLC. I have read the foregoing Complaint, know its contents, and believe the same to be true and correct, except as to such matters stated upon information and belief, and as to such matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November **22**, 2017.

_____
Jason Krueger