UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------X

DTN, LLC,

                Plaintiff,

-against-

MATTHEW WALSH,

                Defendant.

------------------------------------X

Case No.

**AFFIDAVIT IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

STATE OF MINNESOTA    )
                              ) ss.:
COUNTY OF HENNEPIN    )

**JASON KRUEGER**, being duly sworn, deposes and says:

1. I am the Vice President - Mergers and Acquisitions of Plaintiff DTN, LLC ("DTN"), and as such I am fully familiar with the facts and circumstances described herein.

2. I submit this Affidavit in support of DTN's motion for Motion for a Temporary Restraining Order and Preliminary Injunction requiring Defendant Matthew Walsh ("Walsh") to comply with the non-competition agreement Walsh executed in connection with his employment with DTN, preventing his employment with a DTN competitor for one year post Walsh's resignation from DTN, and to comply with Minnesota law in not disclosing DTN trade secrets and other information.

3. Walsh should be enjoined from providing competitive employment for Granular, Inc. ("Granular") or its parent company, Pioneer Hi-Bred International, Inc. ("Pioneer"), or Granular and Pioneer's parent, DowDupont, through at least November 18, 2018, and should be enjoined from disclosing or using DTN's confidential information and trade secrets to unfairly compete against DTN.

4.  For a background of DTN and its products and services, I respectfully refer the Court to the Affidavit of Kip Pendleton submitted simultaneously with my Affidavit. I adopt and incorporate by reference the statements in Mr. Pendleton's Affidavit concerning the background of DTN and Walsh's employment with DTN.

**Walsh's Employment with DTN**

5.  The nature of Walsh's employment with DTN is accurately stated in Mr. Pendleton's Affidavit, and adopted herein by reference. While Walsh was resident for DTN in South Carolina, Walsh regularly reported to DTN in Minnesota, where DTN's main operations are located. Walsh traveled at least monthly to DTN's Minnesota headquarters in connection with his executive and employment responsibilities.

6.  Walsh acknowledged DTN's information management protocols and protections of confidential, sensitive, and proprietary business information when he reviewed DTN's Employee Handbook and Electronic Media Use Policy when he was hired, executing these documents' respective accompanying acknowledgments. Walsh was thus aware of the restrictions in DTN's Employee Handbook and Electronic Media Use Policy. (Copies of the relevant provisions of the Handbook and Media Use Policy are attached as Exs. C and D to the Verified Complaint)

7.  The Employee Handbook provides, among other things, that *"All information composed, sent or received on the electronic media systems are and remain the property of DTN,"* and that *"the E-mail system and intranet should not be used to send (upload) or receive (download) copyrighted materials, trade secrets, proprietary financial information or similar materials without prior authorization from DTN management."* (*Id.* at p. 14)

8.  Additionally, the Employee Handbook specifically identifies transmitting *"trade secrets, proprietary financial information, or similar materials without prior authorization"* and

*"sending any information that would be considered confidential without the appropriate security measures built in."* (*Id.* at p. 15)

9. When Walsh received a promotion to Vice President of Business Development in May 2011, he signed a revised non-compete agreement (the "Non-Competition Agreement"). The Non-Competition Agreement states in pertinent part:

> *You agree that for a period of twelve (12) months following your termination, you shall not directly or indirectly (i) engage for your own account in any business similar to or competitive with any business presently or hereafter conducted by [DTN] or any of the Related Entities or (ii) perform any services in any capacity for any person or entity or any business similar to or competitive with, (other than with the consent of the CEO of [DTN], which constitute engaging in any of the Businesses in any capacity. It shall be understood that the non-compete is not meant to preclude you from viable alternative employment. However it is expected that any alternative employment that is questionable in terms of potential breach of the terms in your offer letter or in this agreement will be disclosed by you to [DTN] prior to accepting alternative employment for our review.*
> (Verified Complaint, Ex. A)

10. In consideration for signing the Non-Competition Agreement, Walsh received a pay increase, eligibility for a bonus of up to 30% of his base salary, payment of graduate school tuition up to $140,000, continued employment and significant additional consideration, including being given access to DTN's confidential and trade secret information and valuable business relationships. DTN would not have provided these benefits to Walsh had he not agreed to be bound by the Non-Competition Agreement and other restrictions concerning treatment of DTN confidential information.

11. In 2012, Walsh's responsibilities were expanded, with Walsh assuming the title and responsibilities of Vice President of Agribusiness. In his role as Vice President of Agribusiness, Walsh oversaw and was fully responsible for all of DTN's agriculture business, including its grain trading operations. As such, Walsh was intimately involved in the development and

implementation of DTN's marketing and business strategies. Walsh also handled buy decisions on products and services and arranged sales and pricing strategies for customers.

12. Walsh also elevated to the position of DTN Leadership Team, which was an important position that gained Walsh access to sensitive DTN information, plans, strategies, and materials.

13. In addition to the Employee Handbook and corporate policies referenced above, DTN also takes other precautions to protect its confidential information and trade secrets and to limit the dissemination of sensitive information.

14. Only authorized employees of DTN have access to the company's confidential information and trade secrets, and all DTN employees are obligated to use this information only in connection with their DTN employment. All employees have a duty not to disclose DTN's confidential information and trade secrets.

15. If DTN's confidential and proprietary information and trade secrets were to become available to a competitor, such as Granular/Pioneer, or otherwise became public knowledge, DTN's competitive advantage and substantial investment in such trade secrets and confidential information would be irreparably injured and/or destroyed.

**Walsh Secretly Violated DTN Company Policy Before He Resigned**

16. Immediately after Walsh resigned to join a competitor on November 17, 2017, I conducted a review of e-mails sent to and from Walsh's DTN company email account.

17. I reviewed Walsh's resignation letter and noted that he indicated he had been putting his plan into action "over the past several months." (A copy of Walsh's resignation letter is attached to the Verified Complaint as Ex. D.) As a result, I began looking at emails Walsh sent going back several months.

18. In the course of my search, I discovered that in the several months before he resigned, Walsh secreted DTN confidential and proprietary business information and customer lists to his personal e-mail, in clear violation of DTN company policy and Walsh's legal duties to DTN.

19. For example, on June 13, 2017, Walsh sent a list of DTN's "TOP 100 CUSTOMERS" for each segment of DTN's business to his personal Gmail account from his DTN account. This list contained the top 100 customers for each vertical business line across DTN's entire business. The Top 100 Customers list was disseminated to only a few high-level individuals by DTN's Vice President of Sales and Retention, Dan Buck.

20. The importance of keeping such highly-confidential customer-related information from DTN's competitors cannot be overstated. Walsh's sending of this proprietary information to his personal account without the approval of DTN's management was in blatant violation of the restrictions set forth in the applicable Employee Handbook and corporate policies. Moreover, the timing of this information transfer raises significant concerns about Walsh's motives. Why was Walsh improperly removing the most-sensitive type of company files only months before his defection to one of DTN's rivals?

21. Approximately two weeks later, on June 27, 2017, Walsh sent another email from his DTN account to his personal Gmail account with a link to a cloud-based Dropbox file. A true and correct copy of the June 27 email is annexed as Ex. B. Since the link was sent from Walsh's DTN account, the information at the Dropbox link presumably includes DTN files, including DTN's proprietary information. Without conducting discovery regarding exactly what Walsh sent to himself, DTN will not know the full-extent of how much company information Walsh

improperly took with him. But the fact that Walsh used a Dropbox file suggests considerable information, data, and materials was secretly transferred from DTN to Walsh's personal account.

22. DTN's proprietary information is extremely valuable to DTN's competitors, including Granular/Pioneer and their parent company DowDupont. No amount of monetary damages are immediately available or may be calculated to account for such a loss.

**The Potential Myriad Transaction**

23. Shortly before Walsh resigned, DTN was exploring a possible acquisition of Myriad Mobile LLC ("Myriad"), a North Dakota company.

24. Given his role, Walsh knew that Myriad was a strategic M&A target, and was intimately familiar with the reasons and benefits of the possible acquisition.

25. On or about October 12, 2017, DTN's Board of Directors instructed that only the Board of Directors and myself would be permitted to have any contacts with Myriad or Pioneer concerning the possible acquisition.

26. I was the only employee designated as the point of contact for Myriad or Pioneer. As such, all other employees, including Walsh, were prohibited from contacting Myriad or Pioneer relating to DTN's business.

27. On or about October 23, 2017, DTN entered into an exclusive Letter of Intent ("LOI") with Myriad.

28. The day after signing the LOI, Pioneer informed DTN that it was aware DTN had signed the LOI with Myriad. It was common knowledge in the industry that Pioneer would also have been interested in making a bid to acquire Myriad, especially if Pioneer knew that DTN was considering such a transaction. Given the timing of his resignation and subsequent employment

by Granular, Walsh likely disclosed confidential information about the Myriad LOI to Granular/Pioneer while he was still employed by DTN.

**Walsh Should be Enjoined**

29. Walsh resigned from DTN, effective December 1, 2017 to work for Granular, one of DTN's most critical direct competitors. Walsh's employment by Granular is in plain violation of the restrictions set forth in the Non-Competition Agreement.

30. DTN's motion for Motion for a Temporary Restraining Order and Preliminary Injunction should be granted because allowing Walsh to work for Granular with the information Walsh has already converted and will continue to provide to Granular will be devastating to DTN, causing DTN irreparable harm.

31. Walsh should be directed to comply with his non-competition agreement, enjoined from providing competitive services for Granular/Pioneer through at least November 18, 2018, and further enjoined from disclosing or using DTN's confidential information and trade secrets to unfairly compete against DTN.

_____
JASON KRUEGER

Sworn to before me this
22 day of November __, 2017

_____
Notary Public

Cathy Joan Fulton
NOTARY PUBLIC
State of Minnesota
My Commission Expires 1-31-2021